## Case No. 13,549.
### STROUT v. The CUBA.[1]
District Court, S. D. New York. Sept. 14, 1861.

SALVAGE — RECAPTURE FROM ENEMY — CREW — RIGHT TO SALVAGE FOR RECAPTURE.

[1. The brig Cuba, valued with her cargo at $12,000 or $15,000, two days out from Trinidad for London, was captured by a Confederate cruiser, and four days thereafter recaptured by the master and crew, and brought safely to New York. Held, that salvage amounting to two-fifths the total value should be awarded, to be borne by the brig and cargo in proportion to their respective values, and costs to be paid out of the remaining three-fifths.]

[2. Capture by a public or private armed vessel of a belligerent power or by a pirate terminates or suspends the contract which binds a seaman to his ship, and rescue or recapture by the master and crew entitles them to salvage.]

[3. Capture by a Confederate cruiser in July, 1861, was capture by a belligerent, so far as the claim of the master and crew for salvage for recapture is concerned, whether the cruiser was, by the laws of the United States, technically a pirate or not.]

[4. The master and part owner of a brig which had been captured by a Confederate cruiser is entitled to salvage for recapture as against the other part owners. The Holder Borden (Case No. 6,600), followed.]

[5. Capture by a belligerent suspends the contract of affreightment, and recapture by the captain and part owner is not within his contract, either as master or carrier, and, since it is a personal service, entitles him to salvage as against the underwriters of the cargo. The Maria Jane, 1 Eng. Law & Eq. 658, distinguished.]

[This was a libel in rem against the brig Cuba and cargo by Daniel J. Strout, master and part owner, and by the crew, under a claim of salvage for recapturing her from the prize crew of a Confederate cruiser. The underwriters of the cargo appeared as respondents.]

Benedict, Burr & Benedict, for libelants.
A. F. Smith, for claimant.

SHIPMAN, District Judge. The facts, as they appear in the proofs in this case, are

---

[2] [From 11 Int. Rev. Rec. 182.]
[1] [Not previously reported.]

substantially as follows: The American brig Cuba, on the 2d of July, 1861, sailed from Trinidad, bound to London, with a cargo of sugar and molasses. Her officers and crew consisted of Capt. Daniel J. Strout; chief mate, James Babbidge; second mate, John Carroll; cook, Thomas Oliver; and John Carter, Charles Gasmer, and John Perry, seamen. Nothing unusual or important occurred on the voyage until early in the morning of the 4th of July, when a steamer was discovered bearing down for the brig. The steamer had the American flag flying, but proved to be the so-called privateer Sumter. She soon neared the brig, fired a shot across her bows, and ordered her to heave to. The brig immediately came to, and was boarded by a body of men from the steamer, armed with cutlasses and heavy navy revolvers. The leader of the boarding crew ordered the captain of the brig to go on board of the steamer, and take his papers. He did so, and on reaching the cabin of the steamer, was introduced to one Semmes, who was alleged to be the commander of the Confederate steamer Sumter. This person examined the captain's papers, and tore them all up, except the register, which he kept. After inquiring to whom the cargo belonged, he announced to Capt. Strout that he and his crew were prisoners of war. After some conversation between Semmes and his confederates, in which the disposition of the brig was discussed, and the proposition to send her, in charge of a prize crew, into Vera Cruz, was negatived, Semmes informed Capt. Strout that he should take her in tow, carry her into Cienfuegos, and sell the cargo and burn the brig. Capt. Strout was then ordered on board of his vessel, accompanied by five men from the steamer, one of whom was called a prize master, two were marines and two sailors. The steamer then took the Cuba, together with the Machias, another vessel, captured that morning, in tow, and started for Cienfuegos. This was about 11 o'clock a. m. They continued in tow till 4 a. m. next morning, when the hawser of the Machias parted and she went adrift; but the fact was not discovered on board the steamer till about an hour and a half after the occurrence. When it was found out that the Machias was gone orders were given by those on board the steamer for the Cuba to let go her hawser and make all sail till the Sumter came up again. The latter then left in pursuit of the Machias, and, after finding her, returned to the Cuba. By this time the sea was running so high that she could not fasten again to the Cuba, and Semmes gave orders to the prize master to take them into Cienfuegos. The brig stood for the last-named port. The prize crew were heavily armed with cutlasses and revolvers, and the crew of the Cuba, being unarmed, were permitted to have the liberty of the deck, and were required to assist in sailing the vessel.

Capt. Strout, who seems to have early formed the idea of baffling the enterprise of his captors, and, if possible of retaking his vessel, privately told his mates, and the others of his men who took their turn at the wheel, to let her fall off on her tacks as much as possible and not attract the notice of the prize crew. This was so successfully done that on the third day after they had parted company with the Sumter, they were twenty miles further off from the port to which they were ordered, than they were when they left the steamer. About this time the prize master appears to have become somewhat suspicious of Capt. Strout and his mates, and at the same time a little more distrustful of his own seamanship. He called Capt. Strout and his mates aft, and asked them to assist them in navigating the brig into Fernandina, Florida; at the same time assuring him that if he gave any more orders, or his men refused to work, he would shoot him. Capt. S. promised to assist the prize master through the Straits of Florida with the brig, and immediately put her before the wind, the prize master giving the course. This was the third day after the capture. On the next day, the 8th of July, and the fourth day after the capture, Capt. Strout and his crew having come to some general understanding to retake the brig, obtained complete possession of her in the following manner: The captain discovered that the prize master was asleep on the after-house, and immediately, with his mates and steward, went to securing the arms. They succeeded in obtaining possession of all, or nearly all, of the weapons. At this time, there were two of the prize crew, besides the master, asleep; one a marine, lying alongside the after hatch. The other marine was lying on deck, alongside the boat, with his head on a revolver wrapped up in a jacket for a pillow, reading. Capt. Strout appears to have secured the other arms without the observation of any of the prize crew, and immediately approached this marine, and jerked the pistol from under his head, demanding his surrender. He yielded at once. But several of the prize crew at this moment discovered that something was in the wind, and went for their arms, and finding them gone, two of them drew their sheath knives, one seized the axe, and all rushed aft, whither Capt. Strout had gone with the pistol he had just taken from the marine. The rush aft awoke the prize master. The mainsail was at this time down, and lying upon the boom; and the prize crew gathered on one side of it, and Capt. Strout and his crew on the other. The mates of the latter and the cook were armed with revolvers, and one of the men with a cutlass. Capt. Strout had a heaver. The prize crew had no arms except the two sheath knives and the axe. One of the prize crew attempted to jump over the mainsail, when Capt. Strout struck him with the heaver, and staggered him. He then ordered his mate to fire on them if they moved. They were then or-

dered by Capt. Strout to surrender, and they made no further resistance, but went forward, followed up by the captain and his crew. Capt. Strout had but two pairs of irons, one of which he put on the prize master, and the other on the most dangerous of the sailors. The rest were tied with marline.

These occurrences were all on the 8th. On the same day they fell in with the brig Costa Rica, which took off two of the sailors of the prize crew, and the Cuba then set sail for New York. Nothing else of importance occurred until the 13th or 14th of July, when the prize master (whose irons had been taken off at his urgent entreaty) repossessed himself of a pistol, and went into the maintop. He then called to Capt. Strout, and told him he wanted to speak with him and all his crew. The captain asked him what he wanted. He asked Capt. Strout if he intended to carry him to New York. He replied that he did. The prize master then said, "You won't carry me alive." Captain S. replied, "Then I will carry you dead." Capt. Strout immediately started below for a pistol, when the prize master called out, and threatened to shoot him if he went below. The captain then jumped below, got a pistol, and fired two shots at the prize master, who still remained in the top, one of which took effect in his arm, and the other struck near his head, in the main cross-trees. He then took him, dressed his wound, and put him in the after cabin under lock and key, and kept a guard over him until they reached New York, where the vessel arrived with all her crew and cargo safe, and her three prisoners, on the 21st of July.

The brig Cuba was owned at this time by parties in Boston and Maine, and by Capt. Strout. The latter owned one-sixteenth of her, having bought and paid for her, but never had any bill of sale of his portion. The other owners of the brig make no objection to an allowance of salvage for which this libel is filed. There is an appearance, however, for and on behalf of the foreign underwriters of the cargo, who have filed their claim, and insist: (1) That if salvage is allowed (and they do not seriously contest the claim of the mates and seamen of the Cuba to some salvage compensation), that allowance should not be one-half, as claimed by the libelants, and should not exceed one-eighth, or at most one-sixth. (2) That if salvage is allowed, no part of it can be adjudged to the captain, because he was part owner of the brig; and that, from whatever sum should be decreed by the court as salvage on the cargo, there should be deducted an amount equal to that to which the captain would have been entitled were his right not barred by his ownership.

Let us, before examining these two main propositions and the arguments urged in support of them, look for a moment at the grounds, if any exist, upon which salvage at all can be given in this case. Nearly all the answers that have been given to the often difficult question, "Who may be salvors?" have been clothed in the language of Lord Stowell's definition. He defines a salvor to be "a person who, without any particular relation to a ship in distress, proffers useful service, and gives it as a volunteer adventurer, without any pre-existing covenant that connected him with the duty of employing himself for the preservation of that ship." Correctly understood, the accuracy of this definition will receive general assent. And it follows, of course, from it, that as a general rule no one, neither master, nor pilot, nor officer, nor seaman, nor passengers, can ever be entitled to salvage for services rendered their own ship in distress, so long as they are discharging those duties only which their relations to that ship impose upon them. Their duties vary, of course, according to their several relations. The duties of the master take a wider range than those of mates, and those of the mates wider than those of the seamen, while the duties of the passenger are much narrower than either. But even the latter is bound to assist in saving or relieving the ship; and so long as the services which he may render are within the line of his duty, he can claim no salvage compensation therefor. Let us glance here at some of the duties which do, and some which do not, devolve on a passenger on board of a ship in distress,—as correct views here will shed light on our path through the other branches of the discussion. The passenger is bound, when the ship is in danger, to render all ordinary assistance in his power; to relieve an exhausted seaman at that post of duty in which he is competent to stand; and to perform any service that he may able, without prolonging or increasing his danger. But clearly he is not bound to remain by the ship to the peril of his life, when he has an opportunity to escape; nor to go to the masthead in a storm, when he is not competent to the task; nor to assume the command and navigation of the ship in case the master is disabled. If a passenger does render these extraordinary services, entirely outside and beyond the scope of his duty, and such services substantially contribute to the saving of the ship and cargo, then he is entitled to some salvage compensation. The Branston, 2 Hagg. Adm. 3, note; The Salacia, Id. 269; Newman v. Walters, 3 Bos. & P. 612.

We naturally come now to inquire into the duties of the master, officers, and crew of a ship in distress; and upon a right view of these depends mainly the result of the case before us. The rules of maritime law, founded upon solid considerations, have carefully and rigorously bound up the interests of the mariner with the destiny of the ship committed to his care. His right to wages generally depends upon the ship's carrying freight, and her success in carrying freight depends upon her safety. When ship and cargo are

lost by a peril of the sea, his right to wages perishes with them. And no exertions, however hazardous, painful or long-continued, when performed in the line of duty which the law draws from his contract, can entitle him to any compensation therefor. But there are limits even to a sailor's duty to his ship; points beyond which the obligations which his contract imposes upon him cease to operate, and at which that contract is suspended or extinguished in judgment of law. In enumerating a few circumstances which operate to suspend or extinguish the contract of seamen, I shall confine myself to that class of cases which are germane to the one under consideration.

1. I regard it as well settled doctrine that capture by a belligerent suspends, if it does not terminate, the contract which binds a seaman to his ship. Clayton v. The Harmony [Case No. 2,871]; Phillips v. McCall [Id. 11,-104]; The Friends, 4 C. Rob. Adm. 143; The Governor Raffaes, 2 Dod. 17, 18; The Florence, 20 Eng. Law & Eq. 609. Some of these authorities hold the contract of the mariner, in case of capture, to be dissolved and terminated; others regard it as only suspended. In the view I take of this case, this distinction is not of a controlling character. It makes no difference whether the capture is by a public or private armed vessel of the belligerent power, so far as its effect on the contract of the officers and crew is concerned.

2. It appears now to be settled law that capture by pirates equally suspends or extinguishes the contract of the mariner. That eminent admiralty judge, Dr. Lushington, has recently stated his views of the effect of such a capture, and, as his reflections are pertinent in several aspects of the present case, I quote them at some length. In the case of The Florence (decided in 1853) 20 Eng. Law & Eq. 609, he remarks: "The contract is for services of the mariner as mariner during a given voyage. The services are not defined in the contract. The duration is for a voyage or voyages, and sometimes for a specified time. In some special cases provision is made for the termination of the contract on the occurrence of other circumstances, as the sale of the ship, or the impossibility of getting a cargo. The services, though not defined in writing, are so by usage; and so is the duration of them in some cases, as in the case of shipwreck, capture, &c. In shipwreck the contract continues so long as a plank can be saved. By capture certainly, if there be no recapture, the contract is at once put an end to; and this, I apprehend, whether by an enemy or by pirates. And here I may observe that by their calling mariners are bound to incur a certain degree of danger, whether it proceeds from an enemy, or from pirates, or from the tempestuous state of the elements; but there is a limit to the risk to which any seaman is bound to expose himself. Human life is more valuable in the sight of God and man than any property, and, if it should so happen that the choice should be between them, there can be no doubt as to which should prevail." But whether a mere piratical capture, strictly speaking, suspends or dissolves the mariner's contract, in judgment of law, or not, is immaterial in the present inquiry, owing to the peculiar and novel circumstances which surround this case. Clearly, this capture suspended the contract, unless the duty of rescuing the Cuba from the hands of these armed men rose out of the obligations of that contract, and was binding upon her officers and crew. Now, what might be the duty of mariners in resisting an attack upon their vessel or rescuing her from a capture by ordinary pirates, those solitary rovers of the sea, who are not only unsupported by confederates, but are under the ban and outlawry of every civilized nation, and are liable to be seized by any and every vessel, public or private, that floats on the sea, and condemned to death by the courts of all nations, I will not stop here to inquire. The duty of the mariners on board of this brig is to be tested by the peculiar circumstances under which they were placed. And it makes no difference, so far as the present question is concerned, whether, in the eye of the criminal law of the United States, the captors of the Cuba are regarded as pirates or not. That question has no connection with the one under consideration. I am here considering only the single question of the obligations of the crew of the Cuba, under their contract as mariners. The steamer which captured this brig was not a solitary sea robber, acting without concert, or any considerable support, but one of a number of marauders which infest the seas in that quarter, having a common end in the plunder of American vessels, and acting under a common pretended authority. She was treated as a belligerent cruiser by one powerful nation, or, at least, held not to be a mere piratical craft, whose crew could be seized and put to death by the courts of that nation. When this brave young captain rescued his brig from the armed crew which the Sumter had put on board of him, she was in the vicinity where he might naturally fear that the very next vessel he should meet would attack and recapture him; and, though in sight of a fleet of war vessels of one of the most powerful nations on the globe, no assistance could be rendered him. She was in the neighborhood of a coast, too, where the inhabitants, for many hundred miles, were in sympathy with the captors, and who, if he had applied to them for assistance, would not only have refused it, but would have restored him and his crew, with the brig and cargo, to those from whom he had rescued her. I am decidedly of the opinion that, under such circumstances, no court, in view of the authorities I have already cited,

would hold that it was the duty of Capt. Strout and his crew, arising out of their contract as mariners, to rescue this brig from the prize crew. If it was not, then their contract was, at least, suspended by the capture.

The next inquiry is, are the captain and his crew entitled to salvage for the rescue? Passing for the moment the question as to the effect of Capt. Strout's ownership of one-sixteenth of the brig on his individual claim to salvage, I will briefly consider the general question. In the case of The Maria Jane, 1 Eng. Law & Eq. 661, the test of the right of a crew to salvage is held to be "whether the service be within the contract or not." In the case of The Florence, already cited (20 Eng. Law & Eq. 611), it is asked: "Then, if the mariner's contract be at an end, may he not be a salvor? He then becomes precisely in the situation which belongs to a salvor, according to Lord Stowell's description in The Neptune. 1 Hagg. Adm. 227. Why should he not be? Why should the owners of ships be deprived of such possible services, or the mariner of such possible reward?" This latter was the case of services rendered by mariners to their own ship after she had been abandoned. And the authorities generally hold that rescue, as well as recapture, confers the right to salvage, at least so far as recapture and rescue from belligerents are concerned, and also recapture from pirates. There is an intimation in a respectable modern author (Marv. Wreck & Salv. § 157) that rescue from pirates confers upon the crew no right to salvage. The author does not state the point with any positiveness, but simply remarks that "it is probable that such a claim would be denied." He cites no authority except articles 35, 36, and 37 of the "Laws of the Hanse Towns," and a glance at these articles will show that they have no significance in the present state of the mariner's relation to his ship in the eye of the law. It is true that those early laws required him to resist the attacks of sea rovers, and at the same time required that their wounds should be cared for at the expense of the ship and cargo by general average, and if he was disabled for life he should be supported as long as he lived in the same manner. But this point is not important. I have no doubt but a rescue from pirates merely entitles the rescuers to salvage; but, if I had a doubt on this point, it could not affect the result of this case, as I hold that under its peculiar circumstances the rescue so far as the merit of Capt. Strout and his crew are concerned, is equivalent to a rescue from belligerents; and, holding that their captors were pirates in the eye of the criminal law of the United States would not change the aspect of this case. The conclusion, then, is that the services which Capt. Strout and his crew rendered in this rescue of the brig and her cargo were not within their contract, but were voluntary and spontaneous, and are entitled to salvage compensation. They were services not required by their contract as mariners, but were wholly beyond the line of their duty. They voluntarily periled their lives for the benefit of the owners of this brig and cargo, and are entitled, upon every just principle, to compensation. And if we were called upon to analyze motives in such a case, we should find the devotion of these mariners to this brig and cargo sprung almost wholly from a single regard to the interests of the owners, unmingled with the instinct of self-preservation, which must always actuate rescuers from mere pirates. Their lives were probably safe so long as they submitted to their capture. They should be rewarded for the voluntary peril they have incurred.

It is proper that I should state here, that no captious or technical objections have been raised on this trial to the right to salvage generally, by the mates and crew, although that right has not been expressly admitted; but counsel acting for foreign, and in a measure unknown, parties, have interposed a legal objection to the recovery of salvage by the captain, on the ground that he was an owner of one sixteenth of the brig salved. This was a proper question to raise, and was pressed with great ability and ingenuity. The question does not seem to have been met in this direct form by any decided case to which my attention has been called, nor have I, after a somewhat diligent examination, been able to find one that decides the precise point.

It is urged that Capt. Strout would be excluded from salvage in the brig by the general rule of law that a joint owner or copartner can never charge the joint property for extraordinary services rendered in its behalf. It is not important to settle this naked point in this case, inasmuch as the co-owners of the brig interpose no objection to any award of salvage which the court may think just and proper to make to the captain. But, as the point arises, I will examine it briefly. It is doubtful whether courts of admiralty apply the general rule above cited very rigidly to salvage cases. In the case of The Holder Borden, tried in the district court of Massachusetts in 1857, and reported in [Case No. 6,600], the doctrine that a master of a vessel and his crew might recover salvage out of property salved by them, and in which they were joint owners with other parties, is distinctly held. It is also held in that case that the owner of a vessel as owner is entitled to salvage for services rendered by his vessel in saving property in which such owner has a joint interest with others. The salvage services rendered in that case were rendered in behalf of a lot of oil, part of the cargo of the wrecked ship Holder Borden, and which belonged jointly to the owners of the Borden and to her officers and crew. The salvage services were rendered by the latter, the shipwrecked mariners of

the Borden. A part of the services were rendered by the crew (including the master of the Borden) on board the brig Delaware, and the latter was owned by Nathan Durfee, who was also joint owner with the salvors and the owners of the Borden in the property saved. Durfee, as owner of the Delaware, and the master and the crew of the Borden, were decreed salvage.

But this objection is leveled mainly at the claim of Capt. Strout to salvage on the cargo of the Cuba; and the case of The Maria Jane, 1 Eng. Law & Eq. 658, is cited. That was a very peculiar case. and although a remark of the judge would seem to favor the objection set up in this case now before us, yet I do not think the decision itself is to be so understood. The judge remarked that the peculiarity of the case distinguished it from all that had gone before it, and I do not think it closely resembles the case now under consideration. Mr. Lilly, whose servants the libelants were, in the case of the Maria Jane, was charterer in possession of the salved ship, and therefore quasi owner, and the owner of the whole cargo,—the ship being worth less than $3,000, and the cargo more than $30,000. It was the duty of Mr. Lilly and of his servants, the libelants, to relieve the ship which Mr. Lilly had chartered, laden, and of which he had the legal possession. It is indeed urged in the present case that it was the duty of Capt. Strout, if not to rescue this cargo, at least to stay by it; and, if it came again into his possession, to return it to the owners. But passing the improbability either of any voluntary release of this cargo by the captors, or of its restoration by any tribunals which would assume to adjudicate upon the capture, it is equally true that the master has the same duties imposed upon him in ordinary cases of belligerent capture. He must stay by, and if the property is restored, must return it to the owners. Phillips v. McCall [Case No. 11,-104]. But this imposes on him no duty to imperil his life by rescuing the property from the possession of an armed force. It is as well settled that belligerent capture suspends the contract of affreightment as the contract of the mariner. This doctrine is explicitly laid down in several cases already cited, and is recognized by Mr. Justice Story in the case of The Nathaniel Hooper [Id. 10,032]. The same test must be applied to the right of salvage on the cargo as on the vessel in this case. Was the rescue within any contract of Capt. Strout, either as master or owner? Clearly not. The same vis major or over-whelming force which discharged him from his duty as master to rescue his ship discharged him as a common carrier by sea from rescuing the cargo. Of course he does not claim salvage as owner of the brig. The brig rendered no service, was in no way instrumental in saving it by rescue. Where owners of vessels as such are awarded salvage, it is where their vessels have been used potentially in the work of saving the property, and perhaps put in jeopardy. The vessel itself in such a case is in one sense a salvor. But here the service rendered was a mere personal one, and the deck of the Cuba was merely the theatre upon which the meritorious act was done. If this cargo had been transferred to the Sumter, together with Capt. Strout and his crew, and they had risen on the crew of the Sumter, overpowered them, and brought the cargo to New York, this objection would not have been urged. And yet I apprehend that Capt. Strout's duty to this cargo was no greater after the capture, and while on board the Cuba, than it would have been on board the Sumter in the case I have supposed. My opinion, therefore, is that the fact that Capt. Strout was owner of one-sixteenth of the brig does not bar his claim to salvage.

The only remaining question is at what rate salvage should be awarded. The only settled rule in the case is that it should be liberal. The libelants claim that one-half would not be too liberal in this case, as they were diligent from the hour of capture till that of rescue, in watching for an opportunity to recover the control of their vessel, and that they performed a perilous act in securing their object. That their conduct was meritorious and praiseworthy, I cheerfully concede. Capt. Strout was young, but vigilant, thoughtful, brave, and discreet; and every man of his officers and crew performed well his part. But the peril of their enterprise, though considerable, was not of the most imminent kind. There were seven of them, all with the liberty of the decks, and with opportunities for consultation. There were but five of the prize crew, and they appear to have been of indifferent character, both as to intelligence and spirit. Capt. Strout seemed to hold them in just contempt when he told their leader that he did not fear them nor their pistols. I think. as the value of the brig and cargo amounts to at least $12.000, and perhaps $15,000, that an award of two-fifths of the whole property salved will be fair; the whole costs to be paid out of the remaining three-fifths; the vessel and cargo to bear the same in ratable proportions on their respective values. The arms taken will be distributed to the captain and mate, unless some further objection is interposed.